You could just give us one minute because we're still shuffling out a lot of papers it's going to make for a bad recording. Whenever you're ready. Good morning and may it please the court. My name is Stephen Tabor and I represent the city of Malibu in this case. This case turns on the FAA's refusal to confront the real world noise burden that was created by the amended flight procedures over Southern California. The law requires more. The FAA cannot sidestep its own scientific data showing that far more people are significantly impacted than its models predicts. And particularly after Marin Audubon case, it cannot rely on a questionable categorical exclusion. Malibu is asking only for what NEPA guarantees. Rational, up-to-date, hard look at how federal actions affect human health and community client. Counsel, I take all of that as very real, certainly understand the environmental concerns. But what concerns me is that your allegations seem to stem entirely from the 2016 flight procedures and not from the 2018 amendments. If that's true, aren't your claims untimely or do you have standing? That's my big concern. If you can get over that, maybe you've got my attention. But you seem to be focusing on something that occurred that's not the subject that we're talking about here. Help me with that, please. Certainly. What we're concerned about and we stated in our brief and the reply brief are the amended procedures that were first proposed in 2018. And the changes that occurred between 2016 and 2018. There are still very real issues with respect to how the environmental impact, how those changes have affected the environment over Southern California. But with respect, perhaps I've misread your brief, but they all seem to go back to the 2016 flight procedures. Some of the changes that were made in 2018 actually involved an increase in height, not a decrease in height, for example. Again, I live in Southern California. I get it. Flights can be very disruptive, but we have a system and I'm just struggling to see how you're not really talking about 2016 with a little cherry pick here and a little cherry pick there in 2018. Help me with that. What am I missing? Well, for one thing, in terms of the raising of the altitude, when the aircraft are given a higher altitude, there's a higher chance that the air traffic controllers will take the aircraft off the procedure and vector them and result in lower altitudes. Much, much lower altitudes. Help me with that. You're saying that because they're at a higher altitude, the air traffic controllers will do something to put them at a lower altitude? Is that what you're saying? That's correct. And there's proof. I don't understand that. There's proof. We mentioned this in the brief. This is called vectoring and the effect of vectoring on the aircraft. And this is a crucial point with respect to the changes between 2016 and 2018. And do you have evidence that this actually occurred? Yes, we do. In terms of, let's see. I thought it was only speculative. Did I miss something? Well, in this case, it's not speculative because the FAA has been running these procedures for, what, seven years now. So there is a wealth of real world data showing that there were, in fact, changes between 2016 and 2018. And, in fact, included in the comments were comments from the City of Los Angeles and from the LA Noise Roundtable, which showed that 90% of the flights were below the minimum altitude. Because of vectoring? Yes, because if they're below the minimum altitude, then they're not on the flight procedure. So can I just, I think, maybe to marry this up, I understand vectoring to be exactly that, a deviation from the otherwise routine approach or flight path. Is that right? That's correct. So can you circle back and answer Judge Smith's question? Because I thought it was a really good question. In 2018, there are instances where the altitude, the minimum altitude actually was raised. And you're saying, but there's something about the 2018 operations that would yield additional vectoring, an increase in vectoring. And then by definition, that means, you know, sometimes people are, planes are going to be flying in at a lower altitude. So where's the support for that in the record? The support for that is what I was mentioning. There is support for that in the City of LA's comments and in the comments from the Los Angeles Noise Roundtable. And where is that in the record, counsel? It's in our excerpts. It's a record from 114 to 126. And you're saying that that's going to tell us that notwithstanding the increased height called for in the 2018, if you will, change, that the FAA is regularly vectoring these things much lower and thereby creating a problem that you've described in environmental terms. Is that right? It's much broader than that. It includes other changes that were made in 2018 that have caused there to be more vectoring. Or at least that's what needs to be studied because vectoring wasn't studied in the environmental, in the categorical exclusion, the environmental document. The effect of vectoring on those changes was not studied. If it had been, then there would be more evidence, more proof, more that those changes affected the way that aircraft fly. But this, again, this is my reading of what you're saying, is that the record you think shows this, my reading says this is pretty much speculation. Is that wrong? I wouldn't say that it's speculation in the sense that there is real world evidence showing that after the increase, after the changes in the flight procedures in 2018, that there was an increase in the number of flights that were flying below the minimum altitude. It's showing that an increase in the minimum altitude does not mean that the aircraft are flying at that altitude. Because of vectoring? Because of vectoring. Which means deviations, is that it? Yes. Okay, and to answer Judge Smith's question, the place in the record we look is 114 to 126 for that? 114 to 126. All right. And this feeds into one of our primary points, that under NEPA, the statute 4332, 49 U.S.C. 4332, that the FAA is required to present an environmental document that has professional and scientific integrity, which this one does not. Based on the fact that the FAA knew at the time that its 65 DNL threshold of significance is not supported by the Neighborhood Environmental Survey, which shows that at 65, if the FAA were correct in that, that would mean that 60 to 70% of the people living under the flight path that this flight procedure creates would be highly annoyed. And the FAA is saying that that is not a significant impact. I'm going to say, counsel, maybe you live in a different universe than I do, but almost any aircraft noise is, you can't say it's insignificant. It's a part of life. You seem to be arguing for a standard of perfection, where you have these aircraft in the air, you don't want to hear any noise, you don't want to receive any pollution. Are you advocating basically that we imitate Harry Potter and use a portkey? What are you doing? No, Your Honor, we're not asking for perfection. We're asking for a scientifically credible analysis of the environmental effects. And the FAA has reported in the Neighborhood Environmental Survey that its reliance on the Schultz-Ficon curve from 1970 is no longer applicable. And that the Neighborhood Environmental Survey itself shows that the high annoyance is much, much five times higher than what was predicted 40 years ago. And that's what we're asking this court to do, is say what we want is a scientifically credible analysis. Thank you. Thank you. Good morning, Your Honors. I'm here for the limited purpose of discussing the FAA's November 19th, 2025 letter concerning the United States Supreme Court's recent decision. Counsel, could you state your appearance for the record? I'm so sorry. Not at all. Could you just state your appearance for the record so we have that on record and then proceed? I didn't hear you, Your Honor. Could you please state your appearance for the record and then proceed? Yes, I will, of course. Sure. My name is Barbara Litchman. Go right ahead. I'm here for petitioner. Thank you. Forgive me, counsel, who do you represent? Sorry? Who do you represent? Do you hear me? You're counsel for whom? I'm not with what? Who's your client? Who's your client? Is there some reason I won't be fined? No, he's just asking you to state your client. Oh, I'm also representing the petitioners in this case. All of them? Yes, sir. Okay, thank you. Go right ahead. As I said, I'm here for a very limited purpose, and that is to address that November 19th letter in which the FAA raised the case that was decided by the Supreme Court on May 25th, 2025, the Seven Counties Infrastructure Coalition versus Eagle County, Texas. They raise it because they find that the expanded scope of deference to agency actions benefits their client. The definition in that case that was created is that what details need to be included in any given EIS, because that case related not just to any statute but to the EIS, what details need to be included in any given EIS is a factual determination of the agency. That's true. Except we're outside the scope of reasonableness. That's true, too. And in this case, the agency has not met the standards specifically set by the court whether agency's action was reasonable and reasonably explained. Because wherever those planes are alleged to now be going, high or low, their operation was not properly explained in the EIS. It was dismissed as minor or the removal of a restriction that had previously been imposed. But nothing more was really done to evaluate the impacts. And I will also say... What would you have done? Sorry. What would you have done? So you're writing the EIS. What would you have said that was different than what was said here? We get EIS planes primarily in connection with Forest Service and things of that nature, but it's the same thing. So your counsel, you're going to write the EIS. What would you have said that was distinct from what was said in this particular case? I don't mean line for line, but what would you have said? What's different? I would have mathematically evaluated the flights, and then I would have said, well, they're higher. Forgive me. What do you mean by the mathematically evaluated? You mean the number of flights? I would have imposed a model. What kind of engines they use? What are we talking about? I would have imposed a model, the accepted modeling for aircraft noise. And what would that have been? What would the model be, a Piper Cub? It would tell me whether there was actually more noise, even if the flight paths had been raised. If there's noise, then it doesn't work. Is that right? Say that again. I'm sorry, sir. If there is more noise, then you can't have an EIS. Is that your view? Well, you can have it. You just have to report it. Okay, and you don't think they reported it? Not properly, no, sir. How should they have reported it? They should have done a much more detailed mathematical analysis instead of simply saying that these were minor changes. And you have some model that you can refer us to that would have been mathematically appropriate? Yes, sir. That's the way it's usually done. But I mean, in what way? Is there a name for it of how one should normally do it? I'm sorry, what was the question? In other words, what is the formula? Is there some magic formula by which the calculation is to be made? That's the way there's a specific FAA noise model, which is used in every EIS, every 99%. And you're saying that they did not use that in this case.  They didn't properly apply it. Correct, Your Honor. And where would you refer to us in the record that that error occurred? I don't have that in front of me because it would be too heavy to carry up here. But it was so heavy, which involves such volume that you can't even carry it up. I'm sure Mr. Tabor has that analysis to me. I'm here only for the limited purpose of discussing that letter and why it was not submitted sooner than two weeks before this appearance. That was one of my issues. But I'm sure that the adequacy of the noise analysis is for this court to judge. But it was not there except to hear. We are not scientists. We have to rely on experts. You have, if I understood you correctly, have basically said that the analysis that was done on the EIS is so big that you can't even carry it to the podium. That seems to be in kind of a contradiction of the idea that they didn't analyze it. They may not have analyzed it the way you like it, but they did analyze it, right? They did other things. I mean, there is a lot in that analysis that doesn't have to do with noise. It's very large. But I mean, when they said it was minor or the removal of a restriction, that's basically it for this analysis. And what do you do with the concept that we are not scientists? We have to rely on scientists. Maybe my colleagues are scientists. I am not. I have to rely on experts. What do we do? I would compare it to other situations, such as the one that existed in Culver City earlier a couple of years ago. And in that case, in which I represented Culver City, there was a deficiency in the noise analysis. And the court found that the FAA had erred, and they were to redo their environmentalist document, which they have not yet done. But this court, this very court, found not only that the environmental documentation was deficient, but that the FAA had not complied with its own order. Now we're back again, and we have no analysis of what those actual noise impacts are. Counsel? Counsel? Counsel, up here. Did you want to reserve any time for rebuttal? Pardon me? Did you want to reserve any time for rebuttal? Yes. All right. You're just a little under two minutes now, so you may reserve. I have it. Okay. And we'll hear from opposing counsel. But it was suggested to me that we discuss that letter, because it is the United States Supreme Court. It does have to do with the standard of review. We understand, and we've heard your argument. Yeah. All right. So if this court has no further questions about that, just to say that removal of restrictions and minor changes— We have no further questions at this point. We have no further questions at this point. Thank you. Thank you.  Well, let me be the first to wish you good afternoon, Your Honor, Judge Christinian. Are we there? Are we? Oh, okay. A little short. A little short? A little short. Justin Heminger for the Federal Aviation Administration. With me at counsel table, I have Nicholas Steinheimer from the FAA. So I don't think this court needs to reach the merits of this case. It should dismiss this case for two related reasons. First, as Judge Smith's questions previewed, the 2016 order that FAA issued was the original order that put these flight procedures in place. Most of the petitioner's arguments are directed at that order, not at the 2024 order, which we acknowledge the petitioners have timely challenged. In 2018? Well, just to clarify, so the changes that FAA made were in 2018. Those were challenged by the city of Los Angeles in the Dixon case. Right. The Dixon case sent that back to the FAA, and so it was the May 2018 amendments to the flight procedures, but they didn't become final until the 2024 order. So I'll refer to that as the 2024 order. Okay. But it's the 2018 changes. That's what we're trying to get at. We've been discussing this as 2016-2018, so. And I'll do that going forward. Thank you. Okay, go right ahead. So as to the 20, so there is a different defect. We acknowledge that as the 2018 changes that FAA made, the cities have timely petitioned for review of those changes. They did so within 60 days. But the cities lack constitutional standing to challenge those changes because they don't, in fact, cause any injury to the cities by increasing noise over either Malibu or Culver City. So for those two related reasons, the court should dismiss this petition for review, both petitions. Based on standing? Correct, Your Honor. So could we just follow up on this vectoring point? Yes. Okay, because I read the argument, I think, or the briefing the way I think Judge Smith reads it. That, you know, in some instances that the actually the changes increased the altitude. But there's also an argument about vectoring, which I understand to be deviations. That's my word. Deviations from what I'll call a flight path and that their position is sometimes that has required or caused aircraft to fly lower and increasing noise. So I'm looking for evidence in the record about that. And there's this declaration of Steve McCleary regarding from city of Malibu. On that, that includes statements about, you know, increase in noise, but I don't know that he ties in, I think, to vectoring in particular. And then we were just asked to look at pages 114 through 126 in the record, which we have before us as well. Could you respond to those? Yes, Your Honor. So first, you understand vectoring the way that I do. It's a deviation from the charted flight course. And to be clear, that's done, that's routinely done for flight procedures to ensure that all the planes land safely. Right. So I think the allegation is something about the 2018 causes more vectoring. That's correct.  So that's the allegation. Right. But our position is that that's not, there's nothing in the record that supports that position. Well, hence, I think Judge Smith's follow-up questions and my follow-up questions about, and maybe Judge Forrest as well, but I think we're looking for evidence in the record to support this allegation. Right. So recognizing that it's the petitioner's burden, but I want to look at the excerpt of record that they pointed to. That's 114 to 126. Right. So I have that here in front of me. So this document clearly can't provide that evidence. And I'll just point the Court to, it's not a page number, it's 114, excerpt of record 114. So if you look at that page, it's the cover page. These are comments that were submitted to the FAA or a presentation that was done at a roundtable about noise.  FAA participates in these roundtables to sort of hear concerns that are going on. But look at the date on that page. This is excerpt of record 114. That's March 2018. So this presentation was done several months before the amendments went into effect in 2018. So it provides no support for the vectoring point that was raised. I read it the same way, the date. Could you turn to – did I – did you want to say more about that? Not about that, Your Honor. Okay. What about this declaration by Steve McCleary? Yes, Your Honor. So the declaration talks – there are a couple points that I would raise about the declaration. So the first is in paragraph 8 of the declaration. Yes. It refers to these as new flight paths. These are not new flight paths. So to be clear, the changes that FAA made adjusted the altitudes in a couple places. Most of those changes occur over the ocean. They don't occur over land. Right, and those aren't at issue. That's correct, Your Honor. Yeah. But these are not new flight paths. These are the same flight paths that have been flown since 2016. The lateral flight path, you know, where the planes fly is exactly the same. So I think there's a misunderstanding here about – fundamentally about what is going on. In paragraph 10, the declarant says the decision has increased – resulted in increased flights along with an increase in aircraft noise over noise-sensitive areas. So FAA also did look at this issue and concluded there were not an increase in the number of flights that were coming in on these procedures. These procedures have been flown continuously since 2016. The only changes that FAA was making were minor safety adjustments to make sure the planes were a little – were coming in a little safer, a little more efficient. That didn't change the number of planes that were actually going to use that route. That's driven by – I don't think they're arguing about the number of planes. I think they're arguing about planes that are vectored. Sure. So on the vectoring – and so – but I wanted to be clear. I don't think that declaration – so there's nothing about vectoring in the declaration. Right. So that – but I did want to point out – It only has this global statement that's resulted – the 2018, what I'm going to call the 2018 – Correct, Your Honor. – has resulted in increased noise. Right. In the briefing, there's this allegation about increased vectoring.  Which is why I'm looking for some place in the record, because we're talking about standing, some place in the record to show evidence supporting this claim. Thank you, Your Honor. I'd like to walk through the vectoring point. Okay. There are a couple of record sites that I'll give you to cover that. Okay. The first, and I think most helpful site, if you were going to read anything in the record about vectoring, would be in the supplemental excerpts of the record that FAA submitted, and that's SER 83 to 86. Say that again, please. Where? Yeah. What? SER 83 to 86. Got it. Thank you. So, to be clear, the petitioners raised – the cities raised vectoring as a process. FAA did a public notice and comment process during this environmental review to give the cities a chance to raise issues. And so the cities did raise vectoring as an issue. FAA pointed out that it made no changes to – you'll read in that excerpt – FAA made no changes to vectoring. And I can show the court – I'll give the court the sites where you can see that. Those would be in the supplemental excerpts of record. And I'll just read off the ranges, because there are three different flight procedures here, but it's 27 to 28, SER 32 to 34, and SER 38 to 40. And I'll just pull up one of those to give an example. So, at 27 to 28 in the supplemental excerpts of record, if you look at the chart there, it's a little hard to find, because there's a lot of technical data, but you'll see toward the end of – there's a paragraph under arrival route description, and at the end of the paragraph on SER 27, it says, expect radar vectors to final approach course. Wait a minute. On the bottom of 27 it says this? So, it's in a paragraph of text. You'll see there's a – and just to sort of walk the court into the example here, this is Appendix B. It's a figure from Appendix B to FAA's technical – that's the title. And then it's Figure 1. This is the 2016 original – this is the plate that tells pilots how to fly the original 2016 flight procedure. And then if you see, there's a paragraph there that says, under arrival route description, like a narrative paragraph. That paragraph tells the pilot each of the steps to take to land the plane. And at the end of that paragraph, you'll see a sentence that says, expect radar vectors to final approach course. So, this is the plate from 2016 that FAA put out as part of its Southern California Metroplex project. Is it fair to say, then, that in 2016, vectoring, in some sense, was altered? It was – vectoring has always been part of how you land, but it was – That's correct, Judge Forrest. And in fact, FAA studied that issue in the NEPA analysis that it did for the Southern California Metroplex project. And so, if I am understanding your argument, your point – one of your points is, nothing about vectoring in and of itself and how it's done and when it should be done and what are the parameters or whatever changed in 2018. You said it much better than I could, yes, Your Honor. That answers my question. I appreciate it's not your burden. I'm just – Yes. And – but just to close out on the – if you look at the next page, that's the chart – that's the modified chart. And I think you understand that sentence is still there. Expect radar vectors from final approach course. So, FAA didn't change that. Right. But I think the argument – again, I'm not going to belabor the point. It's not your burden. Is there something in here that tells us that the rate of vectoring, the incidence of vectoring, did not change? No, Your Honor. I can't think of anything that would go to that. But I agree that it's just speculative to suggest that making a change – and I'm – this is not – you won't see this in the record. But if you look at the flight paths, the changes that were made are upstream. They're not – most of the changes don't – aren't as the planes are approaching the airport. But vectoring is going to – the vectoring is going to happen the closer you get to the airport. Right. Because that's when you have to make sure that you're following the flight controllers and you're landing the plane safely. Do you dispute factually that by – I mean, the assertion by opposing counsel is by increasing altitude, vectoring goes up. And just as a – like, aside from whatever the proof is here, as a concept, do you think that that is viable or no? I just – I can't speak to that. I think that's somewhat speculative. I don't – I'm not sure I can suggest one way or another. I'm struggling with does that even make sense. And I suppose – and maybe it doesn't matter. But I suppose some way it might make sense is vectoring is sort of deviation, as has been talked about. And if you're higher, maybe you need to deviate more often. Perhaps. I guess I would fall back on Judge Smith's observation that, you know, I'm not a scientist and, you know, the FAA, they're the experts. They're the technical experts on that.  I was just trying to figure out just as a concept, is that rational or no? I'm not sure I can help with that. So I do want to point out, too, that FAA did – FAA was sensitive to noise. It knew that was an issue that the cities cared about, and it did noise modeling here, which is not something – when it's applying a categorical exclusion, all it normally does in its normal process would be a screening test, which is a basic test. Here it understood the cities were very upset about plane noise and concerned about it, and so it went a step further. It went above and beyond what it would normally do when applying a categorical exclusion under NEPA, and it did supplemental noise modeling. And the sites for that are in the supplemental excerpts of record from 44 to 55. So FAA did go a step further and actually modeled the noise and concluded that these changes did not increase noise either significantly or even reportable noise, which is a lower threshold. I don't have any further questions. Judge Smith, do you? I do not.  I don't think we have any further questions. Thank you very much. Thank you for your argument. There's a little less than two minutes left on the clock for rebuttal. A couple of things about vectoring. First of all, we're not experts either. Neither the City of Malibu nor the City of Culver City are experts on vectoring and what happens when a flight is vectored. And that is why we are, but it's clear from the evidence that when a flight is vectored, that there are changes, there are changes, or excuse me, when they're taken off the flight procedure, things change, whether it's they fly lower, they fly faster, that sort of thing. What if they even fly higher? I don't even know that. They could fly higher, but the result is when they're coming in on an approach, they want to fly lower. And so that is our point about vectoring, is the FAA needed to analyze what the effects of the changes in the 2018 flight procedures, how that would affect vectoring. How many... Council, with respect, you're a California lawyer. You know what CEQA was. You know what NEPA is. Both Congress and the state legislature have recognized that basically whatever was initially intended, these are tools to stop everything. You're using NEPA, it seems, as a way to stop anything, everything with respect to aviation. You're not sure how to do it. You just want it to stop. You want it to go slower. You want to do something, and you're relying on NEPA. I struggle with this in the same way I do with a lot of the forest cases. You will never come to a point where you will be satisfied, ever. I don't care how much you ask for. That's what we struggle with, is this is not a game of perfection. Congress intended to be environmentally sensitive. They wanted to be sure that you get the best possible treatment. But we live in a modern society, and it's not perfect. Isn't that really what we're dealing with here? You're attempting perfection, and we can't provide perfection under the law. No, we're not looking for perfection. What we're looking for is a scientifically credible analysis. That's what you call it. But it gets down to the same thing, does it not? No, all due respect, no, it doesn't. The fact of the matter is that there is science out there that shows that aviation noise is much worse than what the FAA says. What we want is the FAA to take that information and either explain why 65 decibels, or DNL, should be the significance threshold, still after taking into account the Neighborhood Environmental Survey, or come up with some other system and deal with the fact that there are people on the ground who are highly annoyed with their health being affected and come up with a solution as to what the impacts of this. But there is no solution. There will always be change, there will always be problems, there will always be sensitive people. And that's what these laws are so difficult about. There is no perfection. Either on the ground or in the air, people are going to be affected. And the law doesn't permit us to basically seal people from aircraft. We have to deal with what the law provides here. And with all due respect, it seems to me you're just saying, you know, you think something's wrong. But if we ordered that it be changed as the way you did, you would be back here again, I promise you, with yet another claim that something else was wrong. That's just the way the system is working. Is that right? No, all due respect, again, I do not think that you're right. What the law requires, what NEPA requires, is that we the public and the decision makers are given accurate information, accurate scientific information, and that is not present here. And that is what we're asking for. Granted, I would say that there are some people who would prefer that all aircraft stay on the ground. That's not going to happen. We understand that. Everyone understands that. Everyone understands that aviation is a significant part of our economics. And LAX, for example, is a driver of the economic force. But there has to be some kind of middle ground where we're given the information that we need as a city to govern ourselves, to make changes to our proprietary interests, to give information to our citizens, where the citizens and the people at least, at the very least, feel seen and that their concerns about the effects of these procedures are taken into account and not dismissed out of hand as having no impact on them. Council, we appreciate your argument and your patience with all of our questions. We've taken you way over time, so we're going to end it there. Thank you all. We'll take this case under advisement. We're going to stand and recess for the day. Thank you. I'll rise. This court stands in recess.
judges: SMITH, CHRISTEN, FORREST